IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

LEONEL CANTU LOPEZ,

    Plaintiff,                    No. CIV S-04-0822 LKK KJM P

    vs.

DIANE BUTLER, et al.,             ORDER AND

    Defendants.            FINDINGS AND RECOMMENDATIONS

_____ /

        Plaintiff is a state prison inmate proceeding pro se with a civil rights action under 42 U.S.C. § 1983, alleging that he was injured as the result of a prison riot that defendant Bunnell, a deputy Warden at Folsom State Prison (FSP), failed to prevent. Second Amended Complaint (Sec. Am. Compl.) ¶ 21. Plaintiff and defendant have filed motions for summary judgment; plaintiff argues that defendant's failure to act set in motion those events that caused his injuries, while defendant argues he did not violate plaintiff's rights, his actions were not the cause of plaintiff's injuries, and he is entitled to qualified immunity. Plaintiff also has filed a motion to compel discovery.

I. <u>Motion To Compel</u>

        On April 8, 2008, plaintiff filed a motion to compel defendant Bunnell to answer interrogatories and produce documents. In his affidavit in support of the motion, plaintiff avers

1

1  that he served interrogatories and a second set of requests for production of documents on
2  defendant on March 13, 2008 but has received no response. Defendant contends the discovery
3  requests were not timely.
4        The court's scheduling order permitted the parties to conduct discovery until
5  February 22, 2008, but required any requests for discovery to be served sixty days before that
6  date. It is true that defendant asked for and received an extension of time in which to take
7  plaintiff's deposition, but that order did not reset the discovery deadlines in general. See Docket
8  No. 48. Moreover, plaintiff has not made a showing of good cause to reopen discovery. His
9  motion to compel is not well taken. Wild v. Alster, 377 F.Supp.2d 186, 193 (D.D.C. 2005).
10  II  The Motions For Summary Judgment
11     A. Summary Judgment Standards Under Rule 56
12        Summary judgment is appropriate when it is demonstrated that there exists "no
13  genuine issue as to any material fact and that the moving party is entitled to a judgment as a
14  matter of law." Fed. R. Civ. P. 56(c).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

19  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). "[W]here the
20  nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary
21  judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers
22  to interrogatories, and admissions on file.'" Id. Indeed, summary judgment should be entered,
23  after adequate time for discovery and upon motion, against a party who fails to make a showing
24  sufficient to establish the existence of an element essential to that party's case, and on which that
25  party will bear the burden of proof at trial. See id. at 322. "[A] complete failure of proof
26  concerning an essential element of the nonmoving party's case necessarily renders all other facts

1  immaterial." Id.  In such a circumstance, summary judgment should be granted, "so long as
2  whatever is before the district court demonstrates that the standard for entry of summary
3  judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

4      If the moving party meets its initial responsibility, the burden then shifts to the
5  opposing party to establish that a genuine issue as to any material fact actually does exist. See
6  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to
7  establish the existence of this factual dispute, the opposing party may not rely upon the
8  allegations or denials of its pleadings but is required to tender evidence of specific facts in the
9  form of affidavits, and/or admissible discovery material, in support of its contention that the
10 dispute exists. See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party
11 must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome
12 of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248
13 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.
14 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could
15 return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433,
16 1436 (9th Cir. 1987).

17     In the endeavor to establish the existence of a factual dispute, the opposing party
18 need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the
19 claimed factual dispute be shown to require a jury or judge to resolve the parties' differing
20 versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary
21 judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a
22 genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory
23 committee's note on 1963 amendments).

24     In resolving the summary judgment motion, the court examines the pleadings,
25 depositions, answers to interrogatories, and admissions on file, together with the affidavits, if
26 any. Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed. See Anderson,

477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

On July 20, 2006, the court advised plaintiff of the requirements for opposing a motion under Rule 56 of the Federal Rules of Civil Procedure. See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc), cert. denied, 527 U.S. 1035 (1999); Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

B. Undisputed Facts

In 2002, defendant Bunnell was an Associate Warden at FSP. Def't's Mot. for Summ. J. (DMSJ), Decl. of M. Bunnell (Bunnell Decl.) ¶ 1. Plaintiff, Leonel Lopez, was an inmate at FSP; he was considered a Southern Hispanic because he had lived in Riverside before his conviction. Deposition of Leonel Lopez (Lopez Depo.) 21:5-6.[1] On January 4, 2002, Northern and Southern Hispanics fought with each other, which resulted in a lockdown being imposed on the prison. Bunnell Decl. ¶ 3.

A lockdown is difficult on both inmates and staff; an extended lockdown may lead to constitutional violations. Id. ¶ 4. Correctional staff attempt to determine when the

---

[1] Defendant has submitted excerpts of plaintiff's deposition and a declaration from counsel, purportedly authenticating these excerpts. DMSJ, Decl. of Jeffrey Steele, Ex. A. This is not sufficient authentication. Orr v. Bank of America, NT & SA, 285 F.3d 764, 774 (9th Cir. 2002) (requirements for authenticating a portion of a deposition). The complete deposition lodged by the court is certified, however, so the court relies on it.

4

1 restrictions may be lifted without endangering inmates and staff.  Id.  Supervisory staff thus
2 frequently discussed the potential for violence if the lockdown were ended.  Id. ¶ 5.  In the weeks
3 before April 5, 2002, staff did not receive any information suggesting that either the Northern or
4 Southern Hispanics were planning more violence.  Id. ¶ 6.

5         On April 5, 2002, Warden Diana Butler proposed a controlled unlock of the
6 Northern and Southern Hispanics and a return to regular programming.  Bunnell Decl. ¶¶ 7-8;
7 Def't's Opp'n to Pl.'s Mot. for Summ. J. (Opp'n), Decl. of Michael Bunnell (Bunnell Decl. II) ¶
8 3.  Defendant Bunnell was present at the meeting and agreed with Butler's plan.  Bunnell Decl. ¶
9 8; Bunnell Decl. II ¶ 3.  The supervisory staff at the meeting decided to unlock the buildings one
10 at a time and one tier at a time on April 8.  Bunnell Decl. ¶¶ 9, 11.  This would allow small
11 groups of inmates of different groups to mingle and staff to assess whether further unlocking was
12 feasible or, if it was not, to limit any violence to small groups.  Bunnell Decl. ¶ 11; Bunnell Decl.
13 II ¶ 3.  Other measures were to be instituted on unlock day:  additional staff were to be sent to the
14 yard to stem any disturbances quickly and to identify the participants in any such violence; a
15 correctional officer was to be stationed on a previously unused guard tower; video cameras were
16 to be installed around the yard; and the institution would be searched for weapons in the week
17 before the release.  Bunnell Decl. II ¶ 6; Bunnell Decl. ¶ 16.  This was the usual way an unlock
18 was conducted.  Lopez Depo. at 41:16-19.

19         With Warden Butler scheduled to be away from FSP on April 8, Bunnell was
20 designated Acting Warden.  Bunnell Decl. II ¶ 3.  Bunnell and other supervisory staff met on the
21 morning of April 8 to review the unlock plan again; with no new intelligence suggesting the
22 potential for violence, they agreed to proceed, beginning with Building One.  Bunnell Decl. ¶ 15;
23 Bunnell Decl. II ¶ 4.  Bunnell announced they would proceed with the unlock in accordance with
24 the unlock plan approved on April 5.  Bunnell Decl. II ¶ 4.  Bunnell and Custody Captain Doug
25 Pieper selected a vantage point on a balcony overlooking the yard.  Bunnell Decl. II ¶ 7.
26 /////

1    Plaintiff received a medical ducat on April 8 and so reported to Building Five
2 around 7:30 that morning. Lopez Depo. at 21:10-12. Perhaps an hour and a half later, plaintiff
3 had completed his business with the doctor and was waiting for an escort back to his cell in
4 Building Five. Id. at 21:20-22:7. No escort came and he was let out onto the main yard. Id. at
5 22:8-13. He noticed that a guard was on Tower 22 and a camera was trained on the handball
6 court. Id. at 22:19-25.

7    Bunnell saw that Northern Hispanics were congregating in larger numbers than
8 Southern Hispanics and began to question whether the unlock was proceeding as planned.
9 Bunnell Decl. ¶ 17. He sent Captain Pieper to investigate and correct any problems. Bunnell
10 Decl. II ¶ 7.

11    During the initial phases of the unlock, the Northerners went to the section of the
12 yard near the handball courts, which they frequented, and the Southerners to their usual assembly
13 point. Bunnell Decl. II ¶ 8. Eventually, six or seven Southerners began to move across the yard
14 to the handball courts. Id. Officer Terry White confronted them and then radioed that the
15 "southern boys are going to play some handball." Id. These inmates in fact removed their shirts
16 and began to play handball. Id.

17    Shortly after this, a large group of Southerners began to move toward the handball
18 courts. Plaintiff also saw "a large group of inmates by the handball court and I knew something
19 was wrong." Id. at 23:2-3, 9-10. Then "a big old group" of Southerners approached the handball
20 court. Id. at 23:16-18. Captain Pieper, who had returned to the balcony, said something like,
21 "You're (we're) gonna put it down, right?" Bunnell Decl. II ¶ 9. Bunnell said "no" or "not yet."
22 Id. Even though he recognized that the unlock was not proceeding as planned, Bunnell did not
23 perceive that the Southern Hispanics were intending to fight and so did not immediately give the
24 order to put the yard down. In his experience, previously feuding groups sometimes approach
25 each other at the beginning of unlock to discuss a cessation of hostilities. Bunnell Decl. ¶ 19;
26 Bunnell Decl. II ¶ 9. In addition, the Southern Hispanics were playing handball on the court next

6

1  to the Northern Hispanics' gathering place, so Bunnell was unsure whether the Southerners were
2  simply going to play handball or were going to deal with the Northerners.  Bunnell Decl. ¶ 20; cf.
3  Lopez Depo. at 32:9-11.  Plaintiff recognized, however, that "they are not there to talk to each
4  other, . . . I'm sure of that."  Lopez Depo at 23:21-22.
5      Other officers with equal authority who were present when the Southerners
6  approached the Northerners did not call for the yard to be put down.  Bunnell Decl. ¶ 22.
7  Bunnell continued to watch the inmates closely, but did not believe that violence was imminent.
8  Id. ¶ 21.
9      Nevertheless, several moments later, Southern Hispanics rushed the other inmates,
10 who responded in kind, and then Bunnell ordered the yard down as custody staff moved in to
11 quell the riot.  Bunnell Decl. ¶¶ 23, 25; Bunnell Decl. II ¶ 10; Lopez Depo. at 24:24-25.  Custody
12 staff yelled "get down" and then used pepper spray and rubber bullets when inmates ignored
13 commands to stop fighting.  Bunnell Decl. ¶ 26; Bunnell Decl. II ¶ 10.  The melee was controlled
14 in a very short period of time.  Lopez Depo. at 25:21-22; Bunnell Decl. ¶ 27; Bunnell Decl. II
15 ¶ 10.
16     A guard took plaintiff to the ground even though he was not involved in the
17 fighting.  Lopez Depo. at 25:5-9.  Someone put plastic handcuffs on plaintiff so tightly as to
18 cause injury.  Id. at 26:9-15.  Lopez asked that the restraints be loosened, but the guard did not
19 respond.  Id. at 27:2-7.  His wrist bled, and he continues to have pain and numbness in the area.
20 Id. at 50:3-8.
21     Plaintiff was charged with being a participant in the riot and placed in
22 administrative segregation, but the disciplinary finding was ultimately overturned.  Id. at 33:5-8,
23 34:11-13.  Plaintiff's placement in administrative segregation–the "lock up order--was mentioned
24 in the evaluations prepared before he appeared before the parole board in 2005.  Id. at 15:13-14.
25 In addition, plaintiff was not able to complete some of the board's recommendations, such as
26 attending AA and NA and finishing a trade, while he was in administrative segregation.  Id. at

16:1-4, 11-13.  He was denied parole in 2005, 2006 and 2007 because of the commitment offense and several disciplinary sanctions; in addition, in 2005, Board Member Welch mentioned his failure to pursue a trade.  Id. at 13:4-17, 18:4-7.

        Bunnell did not know that plaintiff was on the yard and had not planned for him to be on or off the yard during the unlock.  Bunnell Decl. ¶ 34; cf. Lopez Depo. at 37:10-15.  Nor did Bunnell have any control over the decision to charge plaintiff with being a participant in the riot.  Bunnell Decl. ¶¶ 35-36; Lopez Depo. at 35:11-15, 36:3-6.  He could not foresee that the plastic restraints placed on plaintiff could injure him; officers are trained to apply these restraints tightly enough to control movement, but not tightly enough to cause injury.  Bunnell Decl. ¶ 39.  There were no hard feelings between plaintiff and defendant before April 8.  Lopez Depo. at 48:11-13.  Had he suspected there would be violence, Bunnell would not have ordered the unlock on April 8.  Bunnell Decl. ¶ 33.  He did not learn until after the riot that the manner in which the unlock was conducted had been changed, apparently as a result of discussions between a captain and a lieutenant following the April 8 morning meeting to confirm the unlock.  Bunnell Decl. ¶ 29; Lopez Depo. at 43:9-17.

        C.  Constitutional Violation

        An inmate's challenge to the conditions of his confinement requires a court to consider whether prison officials were "deliberately indifferent" to his health or safety.  Farmer v. Brennan, 511 U.S. 825, 835 (1994).  However, when the court is considering actions taken by prison officials in the course of responding to a prison disturbance, where such actions are taken "in haste, under pressure, and frequently without the luxury of a second chance," the proper inquiry in determining the subjective component is "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm."  Whitley v. Albers, 475 U.S. 312, 320-21, (1986).  This means there are two standards that are used to determine whether the prison officials have acted with a sufficiently culpable mind: the Farmer standard of deliberate indifference, which is applied to challenges to

1   prison conditions, and the Whitley standard of malicious and sadistic actions, which is applied to
2   challenges to events occurring during exigent circumstances.  Defendant argues he is entitled to
3   application of the Whitley test to the subjective component of plaintiff's Eighth Amendment
4   challenge.  DMSJ at 9.  The Ninth Circuit has suggested that Whitley does not apply to a claim
5   that a prison official failed to prevent a riot, for the "contention does not target behavior during
6   an ongoing prison security measure."  Jeffers v. Gomez, 267 F.3d 895, 913 (9th Cir. 2001); see
7   also Johnson v. Lewis, 217 F.3d 726, 734 (9th Cir. 2000) (actions taken to stop riot and secure
8   inmates evaluated under Whitley standard; acts and omissions when inmates were held on yard
9   after riot, under the Farmer standard).  Under Farmer,

> prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted.

511 U.S. at 844.  The ultimate test is whether the prison official acted reasonably in light of his knowledge; if he did, he is not liable under the Eighth Amendment even if the prisoner is harmed.  Id.

In this case, plaintiff's challenge is to defendant's decision to release the Southern and Northern Hispanics to the yard on April 8 in violation of prison policy and his refusal to allow Pieper to shut the yard down before the confrontation ripened into conflict.  Pl.'s Mot for Summ. J. (PMSJ) at 2-3.  The plan to unlock the inmates and its amendment was not made "in haste and under pressure" and so should be evaluated under the Farmer standard.  Bunnell's decision not to put the yard down when he saw the Southerners approach the Northerners was not made during the actual conflict, but it was made at a time when events were changing rapidly, which suggests the Whitley standard is appropriate.  Nevertheless, even if the Farmer standard is applied, Bunnell is entitled to summary judgment.

Defendant appears to concede the subjective portion of the Farmer test, but argues that Bunnell was not aware that the unlock plan had been modified and so was not aware of the

/////

1  risks, and also did not disregard the risk to inmates in failing to intervene when the Southerners
2  first approached the Northerners.  DMSJ at 9-10.
3          Plaintiff contends that the release of inmates to the yard in violation of prison
4  policy set the stage for the ensuing riot; this suggests he does not challenge the plan as originally
5  devised by defendant and other supervisory personnel for a tier-by-tier, limited release of the
6  inmates.  PMSJ at 1-2.  Plaintiff does allege, however, that the plan ultimately followed–the
7  release of the rival factions at the same time–was a risky endeavor.  Id.  The undisputed evidence
8  shows, however, that defendant Bunnell was unaware that the plan had changed on the morning
9  of April 8, before the unlock began.  Bunnell Decl. ¶ 15.  Accordingly, because there was no
10 evidence that Bunnell was aware of the change and disregarded the risk it created, he cannot be
11 held liable for designing the plan ultimately pursued.  Farmer, 511 U.S. at 837 (prison official not
12 liable "unless the official knows of and disregards an excessive risk to inmate health or safety;
13 the official must both be aware of facts from which the inference could be drawn that a
14 substantial risk of serious harm exists, and he must also draw the inference").
15         Plaintiff next argues that defendant prevented Pieper from shutting the yard down
16 in time to avoid the riots.  PMSJ at 3.  Defendant has several responses to this argument.  First,
17 he contends that any correctional official could have issued the "yard down" order, thereby
18 suggesting that the others did not perceive the risk as well and that he did not have the ultimate
19 authority over Pieper's actions.  Bunnell Decl. ¶ 22.  Second, he argues he reasonably believed
20 the actions of the Southerners were consistent with their desire to play handball or to bury the
21 hatchet with the Northerners.  Id. ¶¶ 19-20.
22         This is a closer question because Bunnell himself acknowledges that Pieper
23 appeared to sense the potential problems stemming from the changed plan for the unlock upon
24 the Southerners' advance on Northern territory.  Bunnell Decl. II ¶ 9.  However, defendant has
25 presented undisputed evidence that he acted reasonably in response to the events unfolding in
26 front of him, even though the unlock was not proceeding as planned and Captain Pieper urged

that the yard be locked down. First, it was important to give the inmates some respite from the restrictions imposed by the lockdown. Bunnell Decl. ¶ 4. Second, Officer White had reported that the Southern Hispanics were planning to play handball and it was not unreasonable for defendant to believe that after months of restricted activity, the inmates might be seeking the physical release of sport. Bunnell Decl. II ¶ 8; Bunnell Decl. ¶ 20. Third, Bunnell had not received any intelligence suggesting that the Southerners had planned to attack their rivals when released. Bunnell Decl. ¶ 6. Fourth, Bunnell was aware of occasions when contact between rivals after a lockdown was a peace overture rather than a renewed attack. Bunnell Decl. II ¶ 9; Bunnell Decl. ¶ 19. While defendant's failure to act may have been mistaken, viewed from hindsight, the undisputed facts show it was reasonable at the time. He is entitled to summary judgment.

### D. Causation

Defendant argues that plaintiff has not shown defendant Bunnell was the cause of his injuries.

The Ninth Circuit has said:

> To sustain an action under section 1983, the plaintiff must show: (1) that the conduct complained of was committed by a person acting under color of state law; and (2) that this conduct deprived the plaintiff of a constitutional right.

Venegas v. Wagner, 831 F.2d 1514, 1518 (9th Cir. 1987). Moreover,

> In a section 1983 cause of action the plaintiff must show that the defendants have deprived him of a right. The language of the statute shows this can be a direct or indirect deprivation. It creates liability for any person who "subjects, or causes to be subjected" particular persons to the deprivation of particular rights. Thus, liability under section 1983 can be established by showing that the defendant personally participated in a deprivation of the plaintiff's rights, or caused such a deprivation to occur.

/////

/////

> The causation requirement of section 1983 . . . is not satisfied by a showing of mere causation in fact. Rather, the plaintiff must establish proximate or legal causation.

Arnold v. International Business Machines Corporation, 637 F.2d 1350, 1355 (9th Cir. 1981) (internal citations omitted); see also Hydrick v. Hunter, 466 F.3d 676, 689 (9th Cir. 2006), petition for cert. filed, 76 U.S.L.W. 3410 (Jan. 17, 2008) (No. 07-958). This standard may be satisfied if the actor sets in motion an act or series of acts the actor knows or reasonably should know would cause others to inflict the constitutional injury. Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978). The chain of causation may be broken by unforeseeable intervening causes. Van Ort v. Stanewich, 92 F.3d 831, 837 (9th Cir. 1996).

The constitutional injuries plaintiff alleges flowed from the riot were the application of excessive force from the improper use of the plastic handcuffs and the ultimate denial of parole because plaintiff did not have access to necessary programs while in segregation. Reed v. McKune, 298 F.3d 946, 954 (10th Cir. 2002) (allegation that inmate was denied parole solely because of failure to participate in programs stated a claim); Davidson v. Flynn, 32 F.3d 27, 30 (2d Cir. 1994) (deliberate use of handcuffs to injure may state a claim).[2]

Defendant's failure to prevent the riot is not the "but for" cause of the denial of plaintiff's application for parole, for plaintiff has not established that he would have been paroled had he been able to finish learning his trade and attending AA and NA. White v. Roper, 901 F.2d 1501, 1506 (9th Cir. 1990) (legal causation is first inquiry). The determination whether to parole an inmate is a "discretionary assessment of a multiplicity of imponderables, entailing primarily what a man is and what he may become rather than simply what he has done." Greenholtz v. Nebraska Penal Inmates, 442 U.S. 1, 10 (1979) (internal citations, quotation omitted). Although one parole board member commented on plaintiff's failure to complete a vocational course and his spotty attendance at NA and AA during 2005, plaintiff has conceded he

---

[2] Plaintiff's placement in administrative segregation is not a sufficient constitutional injury in and of itself. Sandin v. Conner, 515 U.S. 472 (1995)

has been denied parole because of the nature of his commitment offense and his record of sustained disciplinary findings in the institution. Lopez Depo. at 13:4-17. Plaintiff has not shown he would have been paroled had he been able to program in the manner he would have liked during the time he was restricted by segregation.

Even if an act or omission is the "but for" cause of an injury, a defendant may not be liable if the ultimate injury was not foreseeable. Soto v. City of Sacramento, 567 F.Supp. 662, 674 (E.D. Cal. 1983). Defendant has presented undisputed evidence that correctional officers are trained in application of plastic restraints so they are tight enough to prevent an inmate's movement, but not so tight as to cause injury. Bunnell Decl. ¶ 39. Plaintiff has presented no evidence rebutting that offered by defendant Bunnell or showing that defendant Bunnell could reasonably foresee that a correctional officer would maliciously apply restraints on plaintiff so as to cause injury.

IT IS HEREBY ORDERED that plaintiff's motion to compel (docket no. 52) is denied.

IT IS HEREBY RECOMMENDED that:

1. Plaintiff's motion for summary judgment (docket no. 34) be denied, and

2. Defendant's motion for summary judgment (docket no. 58) be granted.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections

/////
/////
/////
/////

shall be served and filed within ten days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED:  September 10, 2008.

_____
U.S. MAGISTRATE JUDGE

2/lope0822.57